UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.: 05-61477-CIV-COOKE/BROWN

MARIA DIAZ, as guardian
and next friend of GERMAN GOMEZ,

    Plaintiff,

v.

SHERIFF KEN JENNE, in his official
capacity, DEPUTY LEWIS PERRY, III,
individually, and UNKNOWN BROWARD
SHERIFF'S DEPUTIES, individually,

    Defendants.
_____/

## ORDER DENYING DEFENDANT KEN JENNE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNTS I AND II

THIS CAUSE is before the Court upon Defendant Ken Jenne's Motion for Partial Summary Judgment (DE 107), filed July 28, 2006. Plaintiff filed his opposition on September 5, 2006. Defendant Ken Jenne filed his reply on September 14, 2006. Plaintiff filed his sur-reply on October 3, 2006. The Court having reviewed the Motions finds, for the reasons set forth below, that Defendant Ken Jenne's Motion for Partial Summary Judgment (DE 107) should be denied.

    I.    **BACKGROUND**

Plaintiff German Gomez ("Plaintiff" or "Gomez") instituted this action on September 7, 2005. The Broward Circuit Court has deemed Gomez incompetent, consequently, Gomez is proceeding in this action through Maria Diaz as his guardian and next friend. In this action,

Gomez seeks compensatory damages in the amount of $15,000,000.00 for injuries he allegedly sustained as a result of an alleged shooting incident involving the Broward County Sheriff's Department.

Gomez avers that on November 3, 2004, he and his cousin Javier Dominguez ("Dominguez") were returning to their apartment after a day of work. Amended Compl. at ¶ 11. Gomez alleges that he and Mr. Dominguez were recent migrants from Mexico and that they had only resided in their apartment for a period of two days prior to November 3, 2004. Id. at ¶ 12. Gomez contends that while they resided in apartment number 218 in building E, on November 3, 2004, he and Mr. Dominguez mistakenly attempted to enter apartment number 218 in building C. Id. at 13. Gomez avers that upon discovering that their key to the apartment did not work, he and Mr. Dominguez knocked on the door to see if any of their roommates were inside the apartment. Id. However, according to Gomez, the apartment was vacant. Id. Gomez avers that a woman who resided in the apartment complex suspected that he and Mr. Dominguez were attempting to break into the vacant apartment and therefore, reported the incident to a 911 dispatcher. Id. at ¶ 14 -17. During the 911 call, the woman allegedly requested to remain anonymous and described the suspects as two Mexican males but did not provide information concerning the suspects' height, weight, facial hair, or whether they were armed. Id. Gomez alleges that Defendant Lewis E. Perry ("Perry") and Deputy Richard Mosca were then dispatched to the apartment complex. Id. at 18. Upon their arrival Defendant Perry and Deputy Mosca allegedly saw Gomez and Mr. Dominguez walking across the parking lot of the apartment complex. Id. At ¶ 19. Gomez avers that Defendant Perry and Deputy Mosca believed that he and Mr. Dominguez matched the description of the anonymous tipster's suspected burglars and as a result the officers attempted to

detain them.  Id.  According to Gomez, when Defendant Perry and Deputy Mosca attempted to detain he and Mr. Dominguez the officers had their guns drawn and pointed at them.  Id. at ¶ 20.  During this confrontation, Defendant Perry and Deputy Mosca allegedly issued commands to Gomez and Mr. Dominguez in English.  Id. at ¶ 21.  Gomez avers, however, that he and Mr. Dominguez do not speak English but rather only speak Spanish.  Id.  Gomez contends that in spite of this language barrier he and Mr. Dominguez slowly walked towards Defendant Perry and Deputy Mosca with their hands raised in the air.  Id. at ¶ 22.  Gomez asserts that Deputy Mosca then began to place handcuffs on Mr. Dominguez.  Id. at 23.  While Deputy Mosca was allegedly in the process of handcuffing Mr. Dominguez, Defendant Perry allegedly discharged his firearm and shot Gomez in the head.  Id. at ¶ 24.

    Gomez avers that a Fire Rescue squad was then dispatched to the scene to administer life stabilization aid to him, but unknown members of the Broward County Sheriff's Department prevented the Fire Rescue squad from assessing his medical needs and providing critical medical treatment.  Id. at ¶ 27.  Gomez alleges that as a result of the alleged shooting and the alleged delay in providing medical assistance he spent two weeks in the intensive care unit at North Broward General Hospital and has spent numerous months in intensive rehabilitation.  Id. at ¶ 28.  Furthermore, Gomez asserts that he suffers from bouts of dizziness, lacks feeling in his right hand and leg, has difficulty walking, has hearing and vision problems, and cognitive problems that manifest themselves through short term memory loss and communication difficulties.  Id. at ¶ 29.  This matter is currently set for the two week trial period beginning February 20, 2007.

## II.  PROCEDURAL HISTORY

    Defendant Ken Jenne filed his Motion for Partial Summary Judgment (DE 107) on July

28, 2006.  Plaintiff filed his opposition on September 5, 2006.  Defendant Ken Jenne filed his reply on September 14, 2006.  Plaintiff filed a sur-reply on October 3, 2006.  Thus, Defendant Ken Jenne's Motion for Partial Summary Judgment is ripe for adjudication.

### III.   SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  According to the U.S. Supreme Court, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.  Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).  See, Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1984) (stating "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts").  However, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).

**IV.    ANALYSIS**

In his Motion, Defendant Ken Jenne ("Jenne") argues that summary judgment is appropriate as to Counts One and Two of the Complaint.  Count One asserts a claim under 42 U.S.C. § 1983 for violation of the Fourth Amendment right to be free from unreasonable seizure.  Count Two asserts a claim under 42 U.S.C. § 1983 for violation of the Fourth Amendment right to be free from excessive force.  See Amended Compl.  According to Jenne, he is entitled to summary judgment on both Counts because: 1) Defendant Perry had reasonable suspicion to effectuate an investigatory stop of Gomez; and 2) Defendant Perry's discharge of his weapon was accidental and therefore lacks the requisite intent necessary to be construed as a violation of the Fourth Amendment.

### A.    A QUESTION OF FACT REMAINS AS TO WHETHER DEFENDANT PERRY HAD REASONABLE SUSPICION TO CONDUCT AN INVESTIGATORY STOP

As a general rule, the Fourth Amendment to the United States Constitution prohibits state actors from making searches or seizures[1] of a person without probable cause.  United States v.

---

[1] "A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Kaupp v. Texas, 538 U.S. 626, 629 (2003) (citing

Dunn, 345 F.3d 1285, 1288 (11th Cir.2003), cert. denied, 542 U.S. 906 (2004).  In Terry v. Ohio, 392 U.S. 1 (1968) the U.S. Supreme Court announced an exception to the probable cause requirement.  Specifically, the Terry court held that minimally intrusive searches and seizures of the person are permissible when a law enforcement officer has an objectively reasonable suspicion that "criminal activity may be afoot."  Terry, 392 U.S. at 30.  See Dunn, 345 F.3d at 1288-89.  Thus, the standard for a lawful Terry stop is significantly less onerous than that for a lawful arrest.  See id.  Similarly, "[r]easonable suspicion, while dependent upon the 'totality of the circumstances,' including both the content of the information and its reliability, 'can arise from information that is less reliable than that required to show probable cause.'"  U.S. v. Heard, 367 F.3d 1275, 1278 (11th Cir. 2004), cert. denied 543 U.S. 913 (2004), (citing Alabama v. White, 496 U.S. 325, 330 (1990)).  Thus, "[e]ven an anonymous tip can, under certain circumstances, give rise to reasonable suspicion, as long as the information provided contains 'sufficient indicia of reliability to justify the investigatory stop.'"  Heard, 367 F.3d at 1278 (citing White, 496 U.S. at 332).  Meaning that the tip must be reliable in its assertion of illegality not just in its tendency to identify a determinate person.  See Florida v. J.L., 529 U.S. 266, 272 (2000).  For instance, in Florida v. J.L. the U.S. Supreme Court held that an anonymous tip lacked sufficient indicia of reliability to establish reasonable suspicion for a Terry investigatory stop and frisk where the tip simply provided an accurate physical description of the suspect but failed to provide any predictive information about the suspect's actions or any explanation as to how the tipster knew about the alleged illegal activity.  Id. at 271-73.  Thus, the cornerstone of whether an anonymous tip can lead to a lawful Terry investigatory stop turns upon the reliability

---

Florida v. Bostick, 501 U.S. 429, 437 (1991)) (internal punctuation omitted).

of the tip. Heard, 367 F.3d at 1278. It is worth noting, however, that the U.S. Supreme Court has found an anonymous tip to exhibit sufficient indicia of reliability to justify a Terry stop where the anonymous tip was corroborated by police investigation. See White, 496 U.S. at 331-32.

In the present action, Jenne asserts several arguments to establish that the stop in question was lawful. In his initial brief, Jenne appears to argue that the anonymous tip was corroborated prior to the stop.[2] Jenne expanded upon this argument in his reply brief by stating "[a]lthough the 911 caller initially decided to remain anonymous, the caller was ultimately identified and spoke with Deputy Mellot who spoke with the 911 complainant on scene, prior to the stop of Gomez." Reply at 4. Further, Jenne asserts that Deputy Mellot, after identifying the anonymous tipster, then gathered more information regarding the complaint which included an update as to the direction in which the suspects were heading. Id. at 4. To support these contentions, Jenne directed the Court to review the Affidavit of Marie Coyne — an audiotape and evidence supervisor for the Broward County Sheriffs' Office ("BSO") — which is accompanied by a transcript of an audiotape of the 911 communications and BSO dispatch communications from the night of the alleged shooting. Jenne argues that this evidence establishes that Deputy Mellot

---

[2]Curiously, this argument was advanced in Jenne's initial brief without any evidentiary support. See Mot. However, in his reply brief Jenne provided transcripts of an audiotape of the 911 communications the night of the alleged shooting. See Reply. Thus, it appears that Jenne waited until after Gomez filed his opposition brief to provide the documentation necessary to elucidate and substantiate the arguments contained within his initial brief. The Court finds this strategy to be somewhat alarming as it could be used to garner an unfair advantage and flouts the purpose of the reply brief which is to rebut the materials contained within the opposition not to assert new arguments and/or present new evidence. See S.D. Fla. L.R. 7.1(C). However, any potential unfair advantaged was thwarted when this Court gave Gomez an opportunity to file a sur-reply to address the newly advanced arguments and evidence in Jenne's reply brief. Nevertheless, Defense Counsel is advised not to employ such tactics in the future.

identified and spoke with the anonymous tipster prior to the alleged shooting and that the anonymous tipster informed Deputy Mellot that the suspects were heading in a northern direction. Additionally, in his reply brief, Jenne argues that the present action is distinguishable from Florida v. J.L., 529 U.S. 266 (2000) because no search of Gomez's person was ever conducted. The Court shall address the merits of these arguments below.

### 1. JENNE'S CONSTRUCTION OF FLORIDA V. J.L., 529 U.S. 266 (2000) Is Not Dispositive

Jenne is correct in his contention that in J.L. the court was evaluating the propriety of a stop and frisk as well as the subsequent seizure of evidence. However, contrary to Jenne's assertion, it does not appear that the J.L. holding is inapplicable to the present action. The critical issue decided in J.L. was whether the officer had the requisite reasonable suspicion under Terry to conduct the investigatory stop and frisk. Id. at 273-74. Thus, J.L. stands for the proposition that without reasonable suspicion stopping and frisking a suspect for investigatory purposes is unlawful. The J.L. court summarized its holding by stating "the requirement that an anonymous tip bear standard indicia of reliability in order to justify a stop in no way diminishes a police officer's prerogative, in accord with Terry, to conduct a protective search of a person who has already been legitimately stopped. We speak in today's decision only of cases in which the officer's authority to make the initial stop is at issue." Id. at 274. Thus, it appears that the J.L. doctrine may be useful in determining whether the stop itself was lawful.

Nevertheless, even if this Court were to accept Jenne's construction of J.L. and find J.L. to be inapplicable to the present action, there is still a plethora of caselaw which establishes that an anonymous tip must exhibit sufficient indicia of reliability to justify an investigatory stop.

See e.g. White, 496 U.S. at 330-33.  Furthermore, the Terry court held that minimally intrusive searches and seizures of the person are permissible when a law enforcement officer has an objectively reasonable suspicion that "criminal activity may be afoot."  Terry, 392 U.S. at 30.  Thus, in order for Perry's investigatory stop to be lawful he still must have had reasonable suspicion.  Consequently, Jenne's arguments concerning the limited application of J.L. is not dispositive in this matter.  Moreover, contrary to Jenne's assertion it does not appear that Perry simply "interdicted," "approached," or "contacted" Gomez.  See Reply.  In his Amended Complaint, Gomez alleged that Perry exited his patrol car and then drew his weapon after issuing several commands directing Gomez and Mr. Dominguez to stop.  Defendant Perry confirmed this allegation in his statement after the shooting.  Specifically, Perry stated:

> I then get out of my vehicle and with the door open and stand by the door and, and I pointed to em and I'm like stop right there.  Stay right there.  And . . . [*pause contained in original*] they just kind of looked at me and then they kept walking towards me.  So at that point I stepped out from behind my car and I drew my service weapon . . . [*pause contained in original*] and I pointed it at them, and I told them several, several times you know get on the ground.  Get on the ground.

Perry Stmt. D. Ex. A. at 7-8.  Importantly, the U.S. Supreme Court has established that "[a] seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"  Kaupp, 538 U.S. at 629 (citing Bostick, 501 U.S. at 437) (internal punctuation omitted).  Therefore, even though Perry did not search Gomez it appears that Gomez was seized, for purposes of the Fourth Amendment, once Perry exited his patrol car directed Gomez to stop and drew his weapon.  See Kaupp, 538 U.S. at 629 (citations omitted).

To hold otherwise would be contrary to established precedent and could substantially erode the protections inherent within the Fourth Amendment.

### 2.  MARIE COYNE'S AFFIDAVIT AND THE AUDIOTAPE TRANSCRIPTS

This Court has made a thorough review of Marie Coyne's Affidavit as well as the transcripts accompanying it; however, this evidence is insufficient to establish, on summary judgment, that the stop in question was lawful. It should be noted that in her Affidavit Marie Coyne stated "Affiant has reviewed the transcript of the audiotape. Although there are portions of the transcript which are not accurate or complete, the transcript is accurate as it relates to the events detailed below, and chronology of those events." Coyne Aff. at 2. Thus, the Affiant herself admits that "portions" of the transcripts are not complete or accurate. While the Affiant does attest that the transcripts are accurate as to the events they detail lingering questions remain as to what portions of the transcripts are incomplete and/or inaccurate and what information is missing from the transcripts. Therefore, an issue of fact remains as to the reliability of the transcripts. Even if the Court were to ignore the transcripts' potential reliability problems, a plethora of issues of fact remain which prevent the Court from granting summary judgment at this juncture. These issues include: 1) whether Deputy Mellot identified the anonymous tipster; 2) whether Deputy Mellot corroborated the anonymous tip prior to Perry's alleged confrontation with Gomez; 3) whether Perry had knowledge that Deputy Mellot corroborated the anonymous tip prior to the confrontation with Gomez; 4) whether Deputy Mellot or any other officers witnessed Gomez and Dominguez running away; 5) whether Perry and/or Deputy Mosca conducted an independent investigation prior to the stop; 6) whether Gomez and/or Dominguez signaled their submission at the time of the stop; and 7) the exact time line and/or chronology of

events surrounding the alleged shooting. Therefore, Jenne is not entitled to summary judgment on Count One of the Amended Complaint.

### B.  A QUESTION OF FACT REMAINS AS TO WHETHER THE DISCHARGE OF PERRY'S WEAPON WAS ACCIDENTAL

Next, Jenne argues that Perry's discharge of his weapon was accidental and therefore Gomez does not have a claim for excessive force under the Fourth Amendment. However, similar to Jenne's arguments concerning Count One, this argument is unavailing. In his brief, Jenne conclusively asserts that the shooting in question was an "accident." See Mot. To support this contention, Jenne directed this Court to examine Perry's Sworn Statement in which Perry indicates that he accidentally discharged his gun after Gomez spun around and hit his hand. Perry Stmt. D. Ex. A. at 9. This assertion, however, is not a foregone conclusion. In fact, Gomez presented this Court with ample evidence which contradicts Jenne's sworn statement and suggests that Gomez did not spin around or hit Perry's gun with his hand. Dominguez Aff. P. Ex. C; Mosca Dep. P. Ex. B. See also James Aff. P. Ex. F (concerning forensic blood splatter evidence). In order to properly resolve this issue the Court would necessarily have to weigh the evidence and engage in credibility determinations, such determinations, however, are beyond the province of this Court on summary judgment. Therefore, Jenne's Motion for Summary Judgment as to Count Two of the Complaint is denied.

### V.     CONCLUSION

For the reasons discussed above it is hereby

**ORDERED AND ADJUDGED** that Defendant Ken Jenne's Motion for Partial Summary Judgment is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 19th day of January, 2007.

*(signed)* Marcia G. Cooke
MARCIA G. COOKE
United States District Judge

*Copies furnished to:*

*All Counsel of Record*